1

2

3

4

5

6

7

8              IN THE UNITED DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   AIRPORT ROAD DEVELOPMENT, LLC,

11              Plaintiff,

12        v.                                    NO. CIV. S-08-1458 GGH

13   LITHIA REAL ESTATE INC.,
                                                ORDER
14

15              Defendant.

16   _____/

17   *Introduction and Summary*

18              Previously pending on this court's law and motion calendar for June 18, 2009 was

19   defendant's, Lithia Real Estate Inc. (Lithia), motion for summary judgment, filed May 12, 2009.[1]

20   Craig Allison and Daniel Croxall appeared for plaintiff, Airport Road Development, LLC

21   (ARD).  Fred Blum and Ruben Ruiz appeared for Lithia.  For the reasons that follow, Lithia's

22   motion for summary judgment is granted.

23              The penultimate issue here is the point at which the parties to a contract may

24   determine that a condition precedent to the obligations in a contract, here the act of a third party

25   _____

26        [1]  The case is before the undersigned pursuant to 28 U.S.C. §636(c)(2), consent to
     proceed before a United States Magistrate Judge.

to purchase property, is not going to be accomplished.  Put another way, when may a party stop actively seeking the accomplishment of a condition precedent.  The undersigned finds here that when a condition precedent is dependent on a third party's actions, conduct by that third party which reasonably and substantially negates the accomplishment of the condition, excuses the obligor from further duty to work to accomplish the condition.  Such is the case here, and Lithia is entitled to summary judgment.

BACKGROUND

The following background facts are without material dispute.

On June 23, 2005, Lithia Real Estate and ARD's predecessor, Clover Creek, entered into a Joint Venture/Development Agreement to develop a parcel of land in Redding referred to as the "New Property."[2]  During the interim period for two and a half years, the parties jointly spent hundreds of hours and over $600,000 in their joint efforts to develop an auto mall on the New Property, and agreed to split these costs.  On September 21, 2005, they purchased the New Property as tenants in common, each owning half of it.

In November 2007, Lithia entered into a Purchase and Sale/Consulting Agreement ("Agreement" or "Purchase Agreement") to purchase ARD's half share of the New Property so that Lithia could develop it into the auto mall.  Allison Decl., Ex. F.  Lithia agreed to pay $3,847,730 which was comprised of $3,697,730 for the ownership interest and $150,000 for ARD's consulting and planning services to Lithia for development.  The purpose was to relocate two auto dealerships from another property owned by Lithia ("Current Property") which the dealerships had apparently outgrown.  A series of events was to first occur which involved the Redding Redevelopment Agency ("Agency") buying the Current Property for approximately $8 million and leasing it back to Lithia pursuant to a lease back agreement ("PSA Agreement").[3]

---

[2]  This parcel is also referred to as the "New 35."

[3]  Although defendant refers to this condition as a PSA agreement and it will be referred to as such in this order, it was not an agreement but rather a condition of the Agreement.

1  Also planned was that the City of Redding was to pay for improvements to the New Property

2  before development of the new auto mall ("Cooperative Agreement").  Lithia would then

3  purchase ARD's half ownership interest in the New Property which all parties agree Lithia

4  claims was contingent on the Agency's purchase and leaseback of the Current Property.  The

5  parties had also agreed that a parcel adjacent to the New Property which Lithia refers to as the

6  ARD Parcel[4] (but which ARD does not own) would be developed pursuant to a CC&R

7  Agreement by March 31, 2008.[5]  The Agency did not purchase the Current Property as planned,

8  but rather offered Lithia only a conceptual option-to-purchase agreement.  The inability of the

9  Agency (essentially the City of Redding) to purchase the Current Property initiated events which

10  by itself, or as ARD claims, in combination with others, doomed the Agreement.

11          ARD has sued Lithia for breach of contract, breach of the covenant of good faith

12  and fair dealing, specific performance, and breach of contract - consulting agreement.  In addition

13  to specific performance, ARD seeks damages for the loss of the sale of the New Property to

14  Lithia, and also for lost opportunities related to the development of the ARD Parcel.  Lithia

15  claims that since ARD does not own any interest in the ARD Parcel, it cannot claim damages for

16  loss of this property.  The complaint was filed in the Superior Court of Shasta County and

17  removed to this court based on diversity.

18  FURTHER FACTS PERTAINING TO THE AGREEMENT

19          The Agreement signed by the parties in November, 2007,[6] provides the following

20  conditions to closing:

21          Lithia's obligation to purchase ARD's Interest in the New 35 under
            this Agreement is conditioned upon: (i) the execution, prior to
22          Closing, of that certain Cooperative Agreement between the City

---

[4]  ARD refers to this property as "the Project" or the 45 (acres).

[5]  The parties dispute whether this date was a deadline to perform or a target date.

[6]  The agreement itself contains the typewritten date, "November ___, 2007."  Thomason states that this agreement was entered into in November, 2007.  (Thomason Decl., ¶ 10.)

1   of Redding, a municipal corporation of the State of California (the
    "City"), ARD and Lithia regarding the planning and development
2   of improvements to Airport Road (the "Airport Road
    Improvements") adjacent to the New 35 (the "Cooperative
3   Agreement"), a draft copy of which is attached hereto and
    incorporated herein as Exhibit C; (ii) *the execution, prior to*
4   *Closing, of a Commercial Property Purchase Agreement and*
    *Commercial Lease Agreement between the City of Redding*
5   *Redevelopment Agency (the "Agency"), as Buyer, and Lithia, as*
    *Seller, of Lithia's four parcels, located at Cypress Avenue and*
6   *Hemsted Avenue in Redding California*; and (iii) resolution of any
    issues arising from or related to the Title Report.
7

8   Agreement, ¶ 4.  (Allison Decl., Ex. F; Ruiz Decl., Ex. B.) (emphasis added).  In a separate

9   paragraph entitled, "Closing; Closing Date," it was provided that Closing would occur no later

10  than ten days after satisfaction of the conditions set forth in paragraph 4 above, and "in the event

11  Closing occurs after November 30, 2007," Lithia acknowledges adjustments in calculating

12  interest.  (Id. , ¶ 5.)  The purchase price of the Current property was to be approximately

13  $8,000,000.  This Order identifies the proposed purchase by the Agency and the leaseback to

14  Lithia as the "PSA Agreement."

15          "Closing" refers to ARD's sale of its half ownership interest in the New 35

16  property to Lithia.  (Id. at p. 1, ¶ 5.)

17          The Agreement contained other subsidiary agreements.  For example, it provided

18  in part:

19          CC&R Agreement. Following closing, Lithia and ARD agree to
            enter into a comprehensive agreement covering the New 35 and
20          ARD's adjacent 45 acre property... placing covenants, conditions
            and restrictions and creating easements, ... (the "CC&R
21          Agreement").  The parties agree to work together to have the
            CC&R Agreement in place by no later than March 31, 2008.
22

23  (Ruiz Decl, Ex.B, Ex. 4 to Compl., ¶ 13.)

24          Another portion of this purchase agreement required Lithia to construct a

25  permanent regional storm water detention basin servicing the New Property ("New 35").  (Id. , ¶

26  9.)  ARD had the responsibility to obtain all "necessary permits, certificates and approvals from

4

1    all applicable government sources for the Detention Basin." (Id.)

2            The purchase by the Agency (Redding) of the Current Property never

3    materialized, however.  The facts leading up to the Agency vote are significant.  It is apparent

4    that the parties undertook substantial work to prepare the way for the Agency (in effect the City

5    Council) to approve the PSA Agreement (the purchase and lease-back agreement).[7]  The point

6    person within the City of Redding was the City manager, Kurt Starman.  At first, all seemed to be

7    proceeding on track.  However, as the clouds over the economy started to gather in early 2008,

8    public dissent concerning purchase of the Current Property was heard by the Agency.

9            Although the vote by the Agency (members of the City Council) was to take place

10   at a February 19, 2008 public meeting, it was postponed to the March 4, 2008 meeting as there

11   was significant public opposition concerning whether the purchase price was fair, as well as

12   numerous other issues, including "unfairness to other businesses not being offered the same type

13   of assistance, Lithia's parent company was not local, Lithia is a wealthy corporation that should

14   not receive government assistance, defining the Cypress Avenue lot as blighted, the proposed

15   location for Lithia on Highway 44 would negatively impact nearby residences and destroy the

16   natural beauty of the area, lack of incentives offered to other car dealers to move to the Highway

17   44 location and the lack of a plan for rehabilitation of the Cypress Avenue property ...." (Ruiz

18   Decl., Ex. I, REDD00011-REDD00013.)   Agency member Dickerson supported the purchase.

19   Agency member Jones expressed reservations with the purchase because although he supported

20   the partnership between the City and Lithia, "he did not support this type of project, but would

21   continue to consider the matter to find a working relationship to make this happen." (Id. at

22   REDD00012.)  Agency member Murray opined that the parcel represented a great commercial

23   opportunity, but that the Agency would not purchase the property unless Lithia expended the

24

25          [7] The court deals with ARD's belated, unsupported contention, contrary to its judicial
     admission, that Lithia did not sufficiently do what it could to bring about the Agency
26   purchase/lease back prior to the Agency vote On March 4, 2008, in the discussion section.

1    funds to make it environmentally clear.  He voiced other restrictions also, such as that the

2    redevelopment money could not be used for other purposes. (Id. at REDD00012-13.)  Redding

3    Vice Mayor/Agency Chair Bosetti opposed the purchase because it would set a dangerous

4    precedent.  He suggested that Lithia instead be offered certain incentives to assist with the

5    project.  (Id. at REDD00013.)

6           In February, 2008, Lithia, acquiring some cold feet of its own, indicated that it

7    might be time to start looking at possible cost saving measures due to the impact of the recession.

8    (Allison Decl., Ex. I, Sid DeBoer Depo., at 68-69.)  On February 22, 2008, Sid DeBoer sent an

9    internal email to sons Bryan and Mark DeBoer, stating, "If I can get Bryan to agree - we need to

10   pull our offer, sell the land in Redding, and remodel where we are - getting some storage

11   somewhere.[8]  Timing on Cap ex is bad currently."  (Allison Decl., Ex. H.)  Mark DeBoer later

12   testified that his father "shoots out odd e-mails from time to time."  He also testified that his

13   brother "made it clear that it's a deal we want to do."  (Allison Decl., Ex. G, Mark DeBoer

14   Depo., at 138.)

15          At a March 4, 2008 public meeting, the Agency was scheduled to vote on an

16   approval to the PSA Agreement; however, no vote on this agreement took place at this meeting.

17   (Ruiz Decl., Ex. C, Starman Depo., at 84:4-14.)  Instead, the Agency proposed an option

18   agreement to Lithia which at that point in time was a concept and was not yet drafted ("Option

19   Agreement").[9]  Nevertheless, a vote took place at this meeting on this concept which was to take

20   the place of the PSA Agreement. ( Id. at 84:17-24.)

21   \\\\\

22

23          [8]  Sid DeBoer is the Chairman, CEO, and Secretary of Lithia Motors, and one of three
24   directors of Lithia Real Estate.  His sons, Mark, Bryan, and Jeff are officers and/or directors of
     Lithia Motors and Lithia Real Estate.

25          [9]  Lithia stated at hearing that it did not attend the March 4, 2008 meeting because it knew
     in advance that the Agency was going to propose the Option Agreement in place of approving the
26   PSA Agreement, and therefore the deal was already undone.

The minutes of this meeting describe the Option Agreement:

> [T]he proposed Option Agreement would seek to encumber the property with an 18-month option to purchase by the Agency for the below-appraised amount of $7.93 million, with a non-refundable $1 million property encumbrance fee that would apply to the purchase price in the event the Agency exercised its option to purchase.  During the 18-month term of the agreement, Mr. Starman said that the Agency would actively market the property utilizing the request for proposal process and the Option Agreement would be contingent on Lithia's proceeding with development of a new auto dealership at Airport Road and State Route 44 (SR 44).

(Ruiz Decl., Ex. J at REDD00001.)

A vote was taken on the Option Agreement, with three agency members voting for entering into this agreement with Lithia, and two members voting against it.[10]  (Id. at REDD00004.)   The City also voted at this meeting four to one in favor of Cooperative Agreement, with the only dissenter being Council Member Bosetti.  (Id. at REDD00003.)

Mr. Starman testified that prior to the March 4th meeting, Lithia never expressed any indication that it was no longer interested in entering into the PSA Agreement with the Agency.  (Starman Depo., at 85:2-10.)  The testimony was that to the contrary, Lithia continued its interest in pursuing both agreements, the PSA Agreement and the Cooperative Agreement. (Id.)

After the March 4th meeting, Starman testified that he communicated with Lithia to see if Lithia would be willing to enter into the Option Agreement instead of the PSA Agreement.  Lithia responded that it was willing, but under two circumstances which Starman believed either converted the Option Agreement back to a sale and purchase agreement or changed the nature of the agreement so that it was no longer an option agreement but permitted a sale to a third party.  (Id. at 86.)  Mr. Starman conveyed this counteroffer information to the

---

[10]  Plaintiff's opposition states that the Agency voted 4 to 1 in favor of asking Lithia to consider the Option Agreement, referring to the same exhibit; however, the exhibit indicates that Murray, Stegall, and Dickerson voted yes, and Bosetti and Jones voted no.  (Id.)

1   Agency which did not agree with Lithia's conditions.  (Id. at 87.)

2          Also after the March 4, 2008 meeting, Thomason met with Patrick Jones, one of

3   the Agency members who had voted against the Option Agreement and who had expressed

4   reservations about the Agency's purchase of the Current Property due to the outdated 2006

5   appraisal which might not reflect the current value of the property.  (Thomason Decl., ¶ 15.)

6   Jones testified at his deposition that he was interested in exploring a new appraisal further.

7   (Allison Decl., Ex. L, Jones Depo., at 21; Ruiz Decl., Ex. K.)  Jones testified that he had told

8   Starman that Thomason had indicated to Jones that Thomason may be willing to pay for a new

9   appraisal.  (Id. at 20:21-21:6.)  At the deposition, Jones was asked about the new appraisal:

10             Q.  And had that [new] appraisal turned out to be consistent with
               the value of the appraisal from two years before, that would be a
11             positive development, in your mind, towards possible approval of
               the project?
12
               A.  Maybe.
13

14   (Id.)    Jones later testified: [b]ut to try to help Lithia, to do what we could, that if, again my

15   thinking was that if we could purchase the property for five dollars, and sell the property for five

16   dollars, and help Lithia, I would be – you know, agreeable to that."  (Id. at 29.)

17          Jones also stated that he did not make a commitment to Thomason one way or

18   another as to how he would vote if the PSA Agreement were presented to the Agency for

19   approval.  (Ruiz Decl., Ex. K, Jones Depo., at 16.)  He testified, "we [Thomason and Jones]

20   never discussed, nor have I ever discussed, how I would vote.  There were simple facts and issues

21   that were of concern, but I never specifically said how I would vote one way or the other."  (Id. at

22   19.)

23          Jones testified that he wanted a new appraisal.  "And that we would then discuss

24   it, once we saw the new appraisal.  The appraisal [on which the potential PSA Agreement was

25   based] was several years old at the time.  It had was taken at the height of the market.  I did not

26   think that was a fair appraisal."  (Id. at 18.)  He stated that he would have to see a current

appraisal and then take the next steps.  (Id.)  When asked if the issue of the appraisal was not his

only criticism or problem with the deal, he replied, "that is correct."  (Id.)

Thomason states that during the March, 2008 meeting with Jones, Jones asked

him if ARD and Lithia would pay for an updated appraisal of the Current Property.  (Thomason

Decl., ¶ 15.)  On March 26, 2008, Starman sent an email to Thomason, stating that Jones had

indicated that Thomason was willing to pay for a new appraisal, and that the City would order the

appraisal and ARD would pay the bill.  Thomason forwarded the email to Mark DeBoer, stating,

"we are, aren't we." (Allison Decl., Ex. M; Ruiz Decl., Ex. L.)  Mark DeBoer replied:

> At this time I have been directed to spend no more money on this
> project.  If the city wants to reinitiate a deal they will have to do so
> at there [sic] own expense and present us what they are proposing.
> As you know every project has a window of opportunity -
> especially given the climate in the market today.  I think our
> window might have past. [sic]

(Id.)

In his deposition, Mark DeBoer testified in regard to sharing the cost of an

updated appraisal, "[w]hat's the appraisal going to come back at in a down economy; right?  I

was guarant[e]ed it was going to be less than what we were willing to sell it for, I just didn't even

want to go there."  (Ruiz Decl., Ex. M at 200:13-20.)

On April 1, 2008, Mark DeBoer sent an email to Thomason and Brad Gray[11]

stating that Lithia's "direction is as I stated before - we are holding off on spending any more

money on this project."  (Id., Ex. N.)   On April 3, 2008, Starman wrote to the "Honorable Mayor

and City Council," passing on information about his phone call with Mark DeBoer that day.

DeBoer had told Starman that Lithia had decided to postpone its expansion plans in Redding for

the time being.  (Id., Ex. O.)

On April 7, 2008, Thomason emailed Starman, asking whether with Lithia saying

the deal was dead, would Starman put forward the Cooperative Agreement or PSA Agreement

---

[11]  Gray is Lithia Real Estate's Executive Vice President.

1   "even with Patrick Jones showing some willingness to be the 3rd vote in favor?" (<u>Id.</u>, Ex. Q.)

2   Starman replied in the negative, that Lithia needed to be on board also, especially for the PSA

3   Agreement. (<u>Id.</u>)

4          On April 8, 2008, Thomason sent an email to Brad Gray with a copy to Mark

5   DeBoer, stating that he did not receive a response from Mark and asking Brad whether the deal

6   was "salvageable or is it dead?"  Mark DeBoer replied to Thomason, stating, "Jon we are going

7   to let the project sit.  I talked to Kurt [Starman] last week and told him the same.  For now we are

8   staying w[h]ere we are and if the city wants to bring us a proposal that is fully approved by

9   council we will take a look." (<u>Id.</u>, Ex. P.)

10         On April 10, 2008, Thomason emailed Mark DeBoer that Lithia's answer to the

11  City was "fairly dodge ball style" and that the City would not proceed with a deal unless it knew

12  the deal was acceptable to Lithia.  Thomason's email refers to someone named Sachs whom

13  ARD indicates was "City Staff" and who said the original deal was acceptable. (<u>Id.</u>, Ex. R;

14  Oppo. at 10:25-26.)  Thomason related his own opinion that he thought the Council would

15  approve that deal.  He asked DeBoer if Lithia would move forward if the City executes those

16  agreements. (<u>Id.</u>)

17         On April 14, 2008, Mark DeBoer responded to Thomason, stating, "[a]t this time

18  we are not willing to do the original deal - times have changed - if the city wants to bring

19  something to us we will listen but our direction is as I previously stated.  We are staying at our

20  current location." (<u>Id.</u>, Ex. S.)

21         On May 12, 2009, Brad Gray signed a declaration stating that after "the April 14,

22  2008 email from Mark DeBoer to Jon Thomason, I spoke with Mr. Thomason and assured him

23  that Lithia was ready, willing, and able to accept the original deal proposed to the Agency and

24  this remains true to this day." (Gray Decl., ¶ 6.)  Thomason's declaration concerning this phone

25  call states that "Mr. Gray came nowhere close to telling me that Lithia wanted and hoped to

26  continue to move forward with the Project.  Instead, consistent with the repeated e-mails I had

1   received from Mark DeBoer during this same time period, Mr. Gray told me that the 'world had

2   changed' for Lithia and that Lithia had elected to put the Project on hold." (Thomason Decl., ¶

3   20.)  Thomason's declaration refers to later conversations between him and Gray wherein Gray

4   "reiterated that Lithia had abandoned the Project and that he hoped to amicably 'dissolve' the

5   partnership with me (ARD)." (Id.)

6   SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

7               Summary judgment is appropriate when it is demonstrated that there exists "no

8   genuine issue as to any material fact and that the moving party is entitled to a judgment as a

9   matter of law."  Fed. R. Civ. P. 56(c).

10              Under summary judgment practice, the moving party
               always bears the initial responsibility of informing the district court
11              of the basis for its motion, and identifying those portions of "the
               pleadings, depositions, answers to interrogatories, and admissions
12              on file, together with the affidavits, if any," which it believes
               demonstrate the absence of a genuine issue of material fact.
13

14   Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

15   P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

16   issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

17   depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

18   should be entered, after adequate time for discovery and upon motion, against a party who fails to

19   make a showing sufficient to establish the existence of an element essential to that party's case,

20   and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

21   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

22   necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

23   should be granted, "so long as whatever is before the district court demonstrates that the standard

24   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

25   2553.

26   \\\\\

1    If the moving party meets its initial responsibility, the burden then shifts to the

2  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

3  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

4  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

5  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

6  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

7  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

8  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

9  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

10  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

11  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

12  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

13  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).[12]

14  DISCUSSION[13]

15    A.  The Law Applied

16    In this diversity action, state law supplies the rule of decision on substantive

17  matters.  Patton v. Cox, 276 F.3d 493, 495 (9th Cir.2002).  The parties do not dispute the use of

18  California law, and application of such is appropriate given the location for performance of the

19  contract.  However, procedural matters, such as the use and nature of judicial admissions, or the

20

---

21    [12] In the endeavor to establish the existence of a factual dispute, the opposing party need
not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed

22  factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the
truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to

23  'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for
trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56(e) advisory

24  committee's note on 1963 amendments).

25    [13] Lithia requests summary judgment of the entire action, and in the alternative summary
adjudication of specific issues.  Because the court finds that summary judgment is warranted, it

26  will not address Lithia's alternative request for summary adjudication.

1    admissibility of expert opinions,  is a procedural matter governed by federal law.  See Nitko

2    Holding v. Boujikian, 491 F.3d 1086, 1089 (9th Cir. 2007).

3              It is well established that it is the court's function, and not that of a jury, to

4    interpret the terms of a contract.

5        The interpretation of a written instrument, even though it involves what might
         properly be called questions of fact (see Thayer, Preliminary Treatise on
6        Evidence, pp. 202-204), is essentially a judicial function to be exercised according
         to the generally accepted canons of interpretation so that the purposes of the
7        instrument may be given effect. (See Civ.Code, ss 1635-1661; Code Civ.Proc., §§
         1856-1866.) Extrinsic evidence is 'admissible to interpret the instrument, but not
8        to give it a meaning to which it is not reasonably susceptible' (Coast Bank v.
         Minderhout, 61 Cal.2d 311, 315, 38 Cal.Rptr. 505, 507, 392 P.2d 265, 267;
9        Nofziger v. Holman, 61 Cal.2d 526, 528, 39 Cal.Rptr. 384, 393 P.2d 696; Imbach
         v. Schultz, 58 Cal.2d 858, 860, 27 Cal.Rptr. 160, 377 P.2d 272), and it is the
10       instrument itself that must be given effect. (Civ.Code, ss 1638, 1639; Code
         Civ.Proc., § 1856.)  It is therefore solely a judicial function to interpret a written
11       instrument unless the interpretation turns upon the credibility of extrinsic
         evidence.

12

13   Parsons v. Bristol Development Co., 62 Cal. 2d 861, 865, 44 Cal. Rptr. 770 (1965).

14           B. Whether Lithia Breached the Agreement Prior to the February-March Agency Non-

15   Action on the PSA Agreement By Failing To Use Reasonable Efforts To Persuade

16           At hearing in order to commence discussion, the undersigned decided to confirm

17   the obvious, based on the complaint in this matter, that ARD was not contending that Lithia had

18   failed to cooperate with ARD in attempting to persuade the Agency to enter into the PSA

19   Agreement prior to the Agency vote on March 4, 2009.  Surprisingly, ARD would not agree, and

20   stated that it had acquired the declaration of an expert to the effect that Lithia "could have done

21   more," such that  Lithia, prior to March 4, 2008, may have violated the provision inherent in

22   every contract that a party to a contract will not take action adverse to fulfillment of contractual

23   conditions or covenants.

24           ARD's contention is belied by its judicial admissions in the complaint.  Paragraph

25   9 of the complaint indicates that after recordation of the deed in which ARD and Lithia became

26   co-tenants of the New Property, "[t]hereafter, and for the two year period following execution of

                                              13

the JV/D Agreement, [either June 2005 or September 2005] *plaintiff worked with defendant* to

obtain government approvals necessary for the anticipated auto mall development... *This*

*included hundreds of hours of work with engineers, City of Redding planning staff, and a variety*

*of consultants, all for the purpose of developing the New 35 for an auto mall.....* (emphasis

added)."  The complaint goes on to discuss the November 2007 Purchase Agreement and the

previously described conditions precedent to that agreement, including the condition that the City

purchase and lease-back the Current Property (PSA Agreement).  Not a word is set forth about

any ARD complaints concerning Lithia's obstructing accomplishment of the conditions after

November 2007 and prior to the Agency non-vote on the PSA Agreement and the offering of the

conceptual option instead.  Not a word is set forth by ARD complaining that Lithia did not do

enough after the November 2007 acceptance of the Purchase Agreement to bring about the

consummation of the PSA Agreement.  Paragraph 16 provides that "*[f]ollowing* the March 4,

2008, City Council meeting [Agency vote on the option to purchase], plaintiff became aware that

defendant had decided to abandon its plans to develop an auto mall" on the New Property

(emphasis added).  Tellingly, the complaint sets forth the specific date of Lithia's first act of

purported breach of obligations – March 27, 2008 – when Mark DeBoer sent an e-mail indicating

that no more Lithia money would be spent on the project.  The complaint relates other actions

post-dating the e-mail, and concludes "that since April 23, 2008, defendant has failed and

refused, and continues to refuse, to undertake any actions necessary to satisfy defendant's

commitments and obligations under the Purchase Agreement."  Paragraph 22.

These factual paragraphs, which relate *nothing* about a pre- March 4 breach are

then incorporated verbatim into the various causes of actions.  Thus, the complaint fairly read

complains only, at best, of a post-March 4, 2008 breach of contract, et. al.  These factual

recitations are binding on ARD.  These allegations constitutes an express judicial admission

which binds ARD throughout this action.  <u>Hakopian v. Mukasey</u>, 551 F.3d 843, 846 (9th Cir.

2008) citing <u>Am. Title Ins. Co. v. Lacelaw Corp.</u>, 861 F.2d 224, 226 (9th Cir. 1998) (noting

allegations in complaint considered judicial admissions).  ARD has not sought to be relieved of

its admissions, nor has it attempted to amend the complaint to state a pre-Agency vote (March 4)

breach.  Therefore, any newly popped-up allegations of breach prior to March 4, 2008, are

ineffectual.[14]   Moreover, Lithia made a summary judgment motion on the facts set forth in the

complaint; it is very unfair for ARD to attempt to avoid the motion by raising issues which are

not included therein.

Even if judicial admissions could be cast aside by the mere filing of an expert

affidavit in opposition to Lithia's summary judgment motion on the allegations of the complaint,

and they cannot, the Diaz Declaration is inadmissible to do so, and misses the legal point besides.

Fed. R. Ev. 702 requires that the expert testimony "assist the trier of fact to understand the

evidence," and "is the product of reliable principles and methods" which have been applied

"reliably to the facts of the case."  The Diaz declaration is simply a very partial recounting of

facts regarding Lithia's not doing enough, e.g., not attending a specific Agency meeting, on

which Diaz then speculates must have had an adverse effect on the Agency vote, and therefore

breached contractual duties.  This speculation does not apply reliable principles and methods,

indeed, the declaration does not purport to use any scientific or technical methods at all.  It is

simply an opinion on non-technical facts as to how the jury should view these facts, which it is

perfectly capable of doing without such assistance.  Nationwide Trans. Finance v. Cass

Information Sys, 523 F.3d 1051, 1059-60 (9th Cir. 2008) (expert's testimony applying UCC law

to facts of case inadmissible either because it is an attempt to instruct the jury on the law, or if

simply an attempt to inform the jury about the expert's view of the facts, because it does not

sufficiently assist the trier of fact).[15]

---

[14]  In its defense to ARD's claims of breach prior to March 26, 2008, Lithia had argued that each act of bad faith alleged by ARD took place after the Agency and Lithia agreed that they could not reach a deal on March 26, 2008.

[15]  Fed. R. Evid. 702 only permits such reports where they will assist the trier of fact to understand the evidence or to determine a fact in issue.

1    Finally, the Diaz declaration misses the legal point, as discussed at length in the

2  next section.  The contractual clause, para. 22, which required the parties to perform those

3  additional acts "necessary or appropriate to effectuate and perform all of the ....conditions of this

4  Agreement" does not require the performance of acts for which there was no likelihood that their

5  performance would effectuate a condition.  Nothing in the Diaz declaration supports a factual

6  finding that *any* pre March 4 act, such as perfect meeting attendance, or the like, would have had

7  the likely effect turning the Agency essential rejection of the condition (PSA Agreement) into an

8  acceptance.[16]

9    For all of the above reasons, ARD cannot oppose Lithia's summary judgment

10  motion by postulating a previously unplead theory of pre-March 4, 2008 breach at odds with the

11  complaint.

12    C.  Whether Lithia Had No Duty to Perform Post-March 4 Pursuant to the Agreement

13  Because the Agency Failed to Adopt the PSA Agreement

14    Thus, Lithia's motion appropriately commences at this juncture with the finding

15  that Lithia did not take action which would preclude the accomplishment of the condition

16  precedents prior to March 4, 2008, nor did it fail to perform actions, in violation of the contract,

17  that likely would have changed the Agency rejection into an acceptance of the PSA Agreement .

18  ───────────────

19    There is no more certain test for determining when experts may be
    used than the common sense inquiry whether the untrained layman

20    would be qualified to determine intelligently and to the best
    possible degree the particular issue without enlightenment from

21    those having a specialized understanding of the subject involved in
    the dispute.

22  Id., Advisory Committee's Notes to 1972 Proposed Rules, *quoting* Ladd, Expert Testimony, 5

23  Vand.L.Rev. 414, 418 (1952).

24    [16]  Even if the contractual terms or the law were to the effect that the parties to the
    Purchase Agreement had implied affirmative obligations to perform everything within their
    power to accomplish the third-party's approval of the condition, regardless of the efficacy of such

25  act, ARD had every bit as much a duty under the contract to see to this as Lithia.  Assuming that
    ARD utilized such efforts, the Agency *still* refused to approve the condition, i.e., purchase the

26  property, rendering any supposed pre-March 4 breach by Lithia inconsequential.

Lithia contends that after March 4, it had no duty to perform because the Agency never approved the PSA Agreement, and that Lithia did not have an obligation post- March 4, 2008 to pay for a new appraisal, or conduct other actions in order to persuade the Agency to rethink its refusal to accept the PSA Agreement.

The parties do not dispute that the Agency's approval of its purchase of the Current Property under the contract terms was a condition precedent to Lithia's performance.

> A condition is a fact, the happening or nonhappening of which creates (condition precedent) or extinguishes (condition subsequent) a duty on the part of the promisor. If the promisor makes an absolute or unconditional promise, he or she is bound to perform when the time arrives; but if the promisor makes a conditional promise, he or she is bound to perform only if the condition precedent occurs, or is relieved from the duty if the condition subsequent occurs. The condition may be the happening of an event, or an act of a party. (See C.C. 1434, 1435; 8 Corbin (Rev. ed.), §30.1 et seq.; 13 Williston 4th, §38:1 et seq.; 17A Am.Jur.2d (2004 ed.), Contracts §454 et seq.; BAJI, No. 10.80 [conditions precedent and subsequent]; CACI, No. 321 [existence of condition precedent disputed], CACI, No. 322 [occurrence of agreed condition precedent], CACI, No. 323 [waiver of condition precedent].)

> A condition precedent is an act that must be performed or an uncertain event that must happen before the promisor's duty of performance arises. (C.C. 1436; see 8 Corbin (Rev. ed.), §30.7; 13 Williston 4th, §§38:7, 38:8; 17A Am.Jur.2d (2004 ed.), Contracts §458; infra, §780 et seq.) (On conditions concurrent, see infra, §792, infra, §809.); on conditions subsequent, see infra, §793; for the new Restatement terminology, see infra, §779.)

1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 776, p. 866.[17]

To be sure, "[e]ach party to a contract has a duty to do what the contract presupposes he will do to accomplish its purpose. [citation omitted] Thus, 'A party who prevents fulfillment of a condition of his own obligation cannot rely on such condition to defeat his liability.'"  Parsons v. Bristol Development Co., 62 Cal. 2d 861, 868, 44 Cal. Rptr. 767, 772

---

[17]See also Wm. R. Clarke Corp. v. Safeco Ins. Co., 15 Cal. 4th 882, 885 (n.1), 64 Cal. Rptr. 2d 578, 579 (1997) (condition precedent must be accomplished before contractual duty arises).

1  (1965).

2          Lithia's duty to perform the Agreement did not arise until the condition precedent

3  was met if Lithia is permitted to rely on the condition precedent.  The parties disagree about

4  whether Lithia had the obligation to continue to use (post-March 4) further efforts to ensure that

5  the condition precedent was ultimately satisfied, and how much time, if any, would pass before it

6  was apparent that the condition precedent would never be met.

7          Before Lithia's duty may be analyzed, one side issue need be disposed.  Lithia

8  asserts that paragraph 13, dealing with Lithia's and ARD's duties with respect to obtaining a

9  CC&R agreement on contiguous properties by March 31, 2008, was a deadline for satisfaction of

10  the conditions precedent.  This paragraph on an independent subject cannot be stretched so far.

11  Not only does the March 31, 2008 "deadline" not refer to the PSA Agreement, the deadline itself

12  is couched in indefinite terms and contemplates what further obligation will accrue if the date is

13  not met.

14          There is no general time-is-of-the-essence clause in the contract.  Without such a

15  clause, and no other specific time for performance, a reasonable time is implied by law.  Cal.

16  Civ. Code § 1657; <u>Fowler v. Ross</u>, 142 Cal. App.3d 472, 479, 191 Cal. Rptr. 183 (1983).  The

17  court agrees with ARD's contention that the March 31, 2008 deadline for the CC&R agreements

18  was not a deadline for the Agency to adopt the PSA Agreement, but merely a target time frame to

19  have the CC&R agreements in place after Lithia had purchased ARD's half interest in the New

20  Property.  Seeing no other deadline in the Agreement, the court must conclude that a reasonable

21  time is implied by the Agreement for satisfaction of the conditions precedent.  Of course, what is

22  reasonable depends on the circumstances of the case, and is generally a matter of fact for the trier

23  of fact, unless the circumstances are such that no reasonable jury could find other than that time

24  had expired for satisfaction of the condition, or that the condition otherwise would not be

25  satisfied.

26  \\\\\

1        Turning to the facts, the undersigned concludes that after March 4, 2008, Lithia

2   had no contractual duty as a matter of law to continue efforts to have the Agency (City) purchase

3   the Current Property as the Agency had, in essence, rejected the PSA Agreement by proposing

4   the option concept.  In any event, the 18 month period in which the Agency had to purchase the

5   Current Property was an unreasonable time as a matter of law in which Lithia would be

6   compelled to wait out satisfaction of the purchase condition.

7        First, the condition precedent has never materialized to this day.  The last official

8   pronouncement *by the Agency* was its failure to vote on the PSA Agreement at the March 4, 2008

9   public meeting, with its tender of an option agreement concept in its place.  This concept  was

10  not a purchase of the property and did not satisfy the condition precedent.  The situation here is

11  somewhat similar to that found in Britschgi v. McCall, 41 Cal. 2d 138 (1953).  Therein,

12  defendants had agreed to sell property to plaintiff "contingent upon the seller being able to

13  eliminate the interest of [a third party] not to exceed $5,000."  Although negotiations ensued with

14  the third party to relinquish his interest for more than $5,000, no deal was ever struck with the

15  third party.  The California Supreme Court found in pertinent part, that the condition was not

16  satisfied, and that there was no language in the agreement or parole evidence that the defendants

17  had ever undertook to sell without the express $5000 condition being satisfied.  "An express

18  condition precedent to performance by a party cannot be construed as imposing a duty on that

19  party to fulfill the condition, where, as here, the language employed does not constitute an

20  undertaking to do so."  Id. At 144.  Similarly, there is no language in the contract at issue or

21  parole evidence which would suggest that Lithia determined it would have settled for less than

22  actual compliance with the purchase condition precedent.

23       But more importantly, the option agreement was so one-sided as to constitute a

24  repudiation in fact of the willingness by the Agency to ever adopt the PSA Agreement.  It was an

25  offer that Lithia was compelled to refuse, and put an end to further obligations on the part of

26  Lithia (or ARD) to attempt to have the Agency retract its option position.  This option concept, as

set forth in the Facts section *supra*, allowed the Agency (City) to stretch out its decision to

purchase the property at *no* risk to the Agency for a period of 18 months.  Given what the parties

had hoped to accomplish in *2008*, this time period was unreasonable as a matter of law.   The one

million dollar price for the option was not refundable *only if the Agency decided to purchase the*

*property.*  The option concept required the City to do almost nothing except attempt to market

the property, but in turn required Lithia take steps to go forward with development of the new

auto dealership *without the money which would be available from the originally contemplated*

*PSA Agreement.*[18]  Having worked with the City Manager and staff to have the Agency purchase

the property in or about March 2008, and having initially been optimistic in that regard, Lithia

could only believe that the option concept was a conclusive bowing to substantial political

pressure within the City, and a polite way to say to Lithia – no way – with respect to an outright

purchase.  Indeed, undisputed, contemporaneous further attempts by Lithia to have the Agency

reconsider the outright purchase, or agree to a modification of the option concept, were rejected.

ARD, nevertheless argues that all was not lost, and that Lithia could not walk

away at this juncture.  ARD might have a point, if the Agency had simply asked for more time to

consider the purchase, or even if the Agency had officially asked for a new appraisal in order to

consider anew the PSA Agreement.  However, no *official* communication was ever made in this

regard.

ARD has submitted a variety of ineffectual evidence attempting to show that the

Agency might still have been willing to go through with the PSA Agreement had Lithia obtained

another appraisal.  ARD claims that Lithia was required to act in good faith to make sure an

updated appraisal was completed so that the condition precedent (the Agency's purchase) to its

performance could be fulfilled.  ARD's authority is both the general duty of good faith and fair

dealing, and a specific duty arising under the specific contract terms which required Lithia to

---

[18]  The Option Agreement may have also required Lithia to forfeit the "non-refundable $1 million property encumbrance fee" in the event that the Agency did not purchase the property**.**

1   "perform such additional acts as may be necessary or appropriate to effectuate and perform all of

2   the terms, provisions, and conditions of this Agreement and transactions contemplated by the

3   Agreement." (Allison Decl., Ex. F, ¶ 22.)

4              As to ARD's attempts to portray the post hoc musings of Council Member Jones

5   as an official decision to reconsider the PSA Agreement if a new appraisal were to be obtained,

6   these attempts fail.  Jones' testimony was far from certain as to how he would vote in the future,

7   presuming another vote took place, and the presumption that another vote would occur on the

8   original PSA Agreement is a huge leap.  In fact, Jones had other concerns aside from the

9   purchase price.  (Ruiz Decl., Ex. K, Jones Depo., at 18.)  Indeed, even if Jones had been able to

10   state how he would vote if a favorable new appraisal had been forthcoming, no one raises the

11   issue of how other council members would have voted were a vote on the PSA Agreement

12   tendered at a future meeting.  Jones did not run the City Council or the Agency.  In fact, Member

13   Bosetti also voted no on the Option Agreement, and it is unknown how this member would have

14   voted on the PSA Agreement if a vote was taken at a later time.  Furthermore, the three members

15   who voted yes to the Option Agreement most likely would have voted no to a reconsidered PSA

16   Agreement if a vote ever took place as they had already expressed a preference for an Option

17   Agreement.  There is just no evidence of how these members would have voted in the future.[19]

18              Furthermore, Starman's (the City Manager) post-hoc opinions about what might

19   happen in the future were not those of the Agency.  First, he was the City Manager only, and was

20

21        [19]ARD has proffered an expert opinion that the value of the land as of April, 2008 was
$10,850,000.  (Allison Decl., Ex. W.)  Lithia disputes this valuation, contending that it assumes

22   the property would be re-used as a car dealership.  Lithia contends that the Agency planned to
develop it as hotel or retail space, however, and therefore the sale price should be limited to its

23   value as raw land only which would decrease the value to $6,285,000, around $1.5 million less
than the original negotiated sales price of $7,900,000.  Reply, at 10-11.  This evidence which

24   raises issues of fact ultimately fails to raise *material* issues of fact as clearly the option concept
was expressly predicated on an actual sale by the Agency of the Current Property for a price

25   equaling or exceeding the PSA Agreement Price, and not a future favorable appraisal.  If all that
the Agency would have needed was a favorable appraisal in order to reconsider the PSA

26   Agreement, it would never have approved the option concept in the first place– it would have
simply asked for a new appraisal and delayed the PSA Agreement vote.

1   not part of the Agency.  He therefore could not be the official voice of the Agency and could not

2   vote on the PSA Agreement.  After all, Starman was part of City staff which had been of the

3   opinion that the Purchase Agreement would be favorably received by the Agency in the first

4   place.  This initial belief was quite errant.  Additionally, emails between individuals which

5   include hearsay cannot constitute the official expression of the Agency.[20]

6         Finally, ARD goes to great lengths to show that Lithia was acquiring second

7   thoughts about the deal due to economic reasons of its own, and therefore had motivation not to

8   try very hard to overcome the initial, essential, rejection of the PSA Agreement proposal.  ARD

9   translates these second thoughts into bad faith on the part of Lithia, or at least an indication that

10   Lithia was not using best efforts to persuade The Agency to ultimately accept the SA Agreement.

11         Where a condition precedent is concerned, the standard for Lithia's actions is only

12   that it act reasonably.  Lithia had no duty to subjectively act in good faith in this regard.  Storek

13   & Storek, Inc. v. Citicorp, 100 Cal.App.4th 44, 62, 122 Cal. Rptr.2d 267, 282 (2002) (finding

14   defendant had no duty to act in good faith to determine whether condition precedent to its

15   performance was fulfilled; reasonableness was all that was required).  Expressions of doubt and

16   buyer's (and/or seller's) remorse about the Agreement by Lithia's officers are subjective opinions

17   and are therefore irrelevant in light of the objective fact that the PSA Agreement had been

18   rejected.  Furthermore, Lithia's internal communications which indicate conflicting opinions

19   about whether to go forward with the deal or not, do not constitute an official rejection on the

20   part of Lithia.[21]  The only relevant evidence on this point would be whether a reasonable person

21   would think the PSA deal was essentially dead after the Agency's vote.  For the reasons set forth

22   above, a reasonable person would not have tilted at windmills, or conducted other quixotic

23

24      [20]  Nor for that matter could individual opinions of Lithia's executives constitute an official position by Lithia.

25      [21]  Sid DeBoer appeared to have doubts about going forward based on the current

26   economy while his son, Bryan, wanted to go forward with the deal.  (Allison Decl., Ex. I, Sid DeBoer Depo., at 68-69; Ex. H; Ex. G, Mark DeBoer Depo. at 140.)

activities, and would have believed the condition to be unattainable.  This is so regardless of the fact that other subjective considerations perhaps would have made Lithia desire that the Agency not reconsider its rejection.[22]

Finally, ARD's essential position that pursuant to paragraph 22 Lithia was contractually bound to perform every conceivable act, remote in successful outcome as it may be, is untenable.

First, to the extent that ARD is arguing that Lithia had a duty to accept less than satisfaction of the express condition, Britschgl, supra, dispels that argument.  Secondly, the paragraph is not a best efforts paragraph, but is rather a paragraph which does not permit technical obstacles to stand in the way of bringing the Purchase Agreement to fruition.  The essential rejection of the PSA Agreement by the agency is not a technical obstacle.

If interpreted as requiring Lithia to try to bring the condition into existence by "necessary" or "appropriate" actions, nothing in paragraph 22 required Lithia to bang its head against a wall of refusal for some indeterminate amount of time, or required Lithia to see "maybe" out of an unequivocal, albeit essential, rejection of a necessary condition by the third party Agency.  "Necessary" or "appropriate" actions implies that the actions advocated would have a reasonable likelihood of being effective.  The clause does not read that Lithia must perform: "everything possible regardless of its likelihood of success."  For the reasons previously stated, because the *Agency* made no post-option concept official communication in the matter about an appraisal or other act (and even the individual banter with one Agency member was completely inconclusive), there are no material facts in this case which would suggest that a new appraisal (assuming it would have appraised the property at the same price or higher) or any other

---

[22] ARD's argument is akin to holding that a person holding a durable power of attorney with respect to life support measures for a relative, when told by physicians that no effective, immediate means exist to save the relative's life, must nevertheless order heroic measures to be taken with life support because the attorney-in-fact held a subjective belief that he did not much like the relative anyway.

1   act would likely have been a game changer.  No reasonable jury could find so on this record.

2          Lithia appropriately distinguished ARD's cited cases of <u>Jacobs v. Tenneco West</u>,

3   186 Cal. App. 3d 1413, 1415 (1986), and <u>Abrams v. Motter</u>, 3 Cal. App. 3d 828, 834 (1970),

4   which hold that a person who takes wrongful action in precluding the fruition of a condition

5   bears the burden of showing that the condition would not have been accomplished in any event.

6   The point here, oft repeated now, is that Lithia's conduct in accepting the essential rejection of

7   the PSA agreement by the Agency, whether happily or not, was not wrongful.

8          ARD has submitted an expert opinion to the effect that Lithia failed to take

9   "reasonable and necessary" steps to obtain approval of the Project for numerous reasons,

10  including failing to agree to pay for an updated appraisal after the March 4 essential rejection.

11  (Allison Decl., Ex. Z, Diaz Report.)  As previously found, this report is inadmissible as expert

12  testimony.  The trier of fact would not require, and would not be permitted to hear, an expert

13  opinion in order to determine what a reasonable company should have done under the

14  circumstances.  In any event, Lithia's actions in determining that the Agency option concept was

15  the death knell of the condition precedent, and hence the Agreement, were reasonable as a matter

16  of law.

17          D.   <u>Remaining Issues for Summary Judgment</u>

18          Lithia raises the following separate issues for summary adjudication: "Lithia has

19  no obligation to perform pursuant to the Agreement because the parties failed to meet the March

20  31, 2008 deadline for the completion of the CC&R agreement; Lithia has no obligation to

21  construct the detention basin because ARD failed to secure the required grading permits for its

22  construction; [and] ARD is barred from claiming damages for alleged future development of

23  lands surrounding the property because it does not own the lands."

24          1.   <u>CC&R Agreement</u>

25          The CC&R Agreement could only take place after "Closing," which pertained to

26  ARD's sale of its half ownership interest in the New 35 property to Lithia.  (<u>Id.</u> at p. 1, ¶ 5.)

1    "Conditions to Closing" required, inter alia, that the Agency purchase the Current Property from

2    Lithia.  (Id. at ¶ 4.)  Because Lithia's duty to "close" never arose following the failure of the

3    condition precedent requiring the Agency to purchase Lithia's Current Property, the other

4    components to the Agreement were never brought into play.

5              2.  Detention Basin

6              Under the Agreement, Lithia was to construct a detention basin servicing in part

7    the New 35, contingent on ARD obtaining needed permits.  (Id. , ¶ 9.)  ARD did not obtain the

8    permits but now states that it should have the permits by July 31, 2009.  Although the Agreement

9    does not specify the timing or conditions preceding Lithia's duty to construct the detention basin,

10   a reading of the entire Agreement clearly indicates that the conditions precedent and the Closing

11   referred to above are preconditions to the construction of the detention basin.  Without the

12   Agency's purchase of Lithia's Current Property, no other contractual duties arose.

13             3.  Damages for Alleged Future Development of Surrounding Lands

14             Based on the grant of summary judgment in Lithia's favor, it is not necessary to

15   reach this issue.

16   CONCLUSION

17             For the foregoing reasons, IT IS HEREBY ORDERED that defendant Lithia's

18   motion for summary judgment filed May 12, 2009 (Docket # 31), is granted, and judgment

19   entered for Lithia.  The Clerk shall enter a separate judgment in favor of Lithia.

20   DATED: 07/10/09

                                        /s/ Gregory G. Hollows
21
                                        _____
22                                      GREGORY G. HOLLOWS
                                        UNITED STATES MAGISTRATE JUDGE
23

     GGH:076/Airport1458.sj.wpd
24

25

26